IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 17-cv-02232-MEH

DANICA M. NESS,

    Plaintiff,

v.

NANCY A. BERRYHILL, Acting Commissioner of the Social Security Administration,

    Defendant.

_____

# ORDER
_____

**Michael E. Hegarty, United States Magistrate Judge**.

    Plaintiff Danica M. Ness appeals from the Social Security Administration ("SSA") Commissioner's final decision denying her application for disability insurance benefits ("DIB"), filed pursuant to Title II of the Social Security Act, 42 U.S.C. §§ 401–33. Jurisdiction is proper under 42 U.S.C. § 405(g). I hold the ALJ did not err in assigning little weight to the state consultant's opinion that Ms. Ness must have minimal to no interaction with the general public. Accordingly, I affirm the ALJ's decision that Ms. Ness was not disabled from December 24, 2013 through the date of the decision.

## BACKGROUND

**I.    Ms. Ness' Conditions**

    Ms. Ness was born on December 31, 1970; she was forty-three years old when she filed her application for DIB. [AR 132]. Ms. Ness claims she became disabled on December 24, 2013. [*Id.*]

In October 2011, Ms. Ness took a cognitive skills profile test and scored significantly lower than the standard percentile in thirteen different categories, such as long-term memory, math fluency, and visual processing. [AR 241].

In March 2014, Ms. Ness received a psychological evaluation by Psychologist David Benson. [AR 235]. The evaluation included a Wechsler Adult Intelligence Scale – Fourth Edition, in which Ms. Ness posted a full scale IQ of 65; she was in the borderline range for two categories (verbal comprehension and perceptual reasoning) and the mental retardation range for two categories (working memory and processing speed). [*Id.*] Following the test, Dr. Benson reported that Ms. Ness has "a poor vocabulary and low fund of general information" as well as "particularly low visual mental mathematic skills." [AR 238]. Dr. Benson also noted that Ms. Ness will "struggle in work above the semi-skilled to unskilled level" and is "more suited for work that is hands on or performance oriented." [*Id.*] Ms. Ness' psychological evaluation also included a Wide Range Achievement Test, which revealed an eighth grade competency in reading, sixth grade proficiency in spelling, and second grade ability in arithmetic. [*Id.*] Based on these results, Dr. Benson reported that Ms. Ness possesses an "actual ability to read and comprehend," but her math skills are "significantly below the expected level." [*Id.*]

In his overall summary, Dr. Benson reported that despite certain intellectual limitations, Ms. Ness could draw on her existing knowledge and experience or train in a specialized area that does not require complex skills. [AR 240].

Dr. MaryAnn Wharry, the state agency psychological consultant, completed a disability determination on Ms. Ness in August 2014. [AR 68]. In making her findings, Dr. Wharry only reviewed the record; she did not visit with Ms. Ness. Opening Br. 3, ECF No. 16. Dr. Wharry

2

concluded that Ms. Ness has some intellectual impairment but is able to understand simple instructions and care for her personal needs. [AR 78]. Despite mentioning that Ms. Ness may not be able to perform her past work, Dr. Wharry opined that Ms. Ness' condition is "not considered totally disabling at this time." [*Id.*] However, Dr. Wharry stated that Ms. Ness "must have minimal to no interaction with the general public." [AR 75].

Ms. Ness began seeing Dr. David Minkoff at Lifeworks Wellness Center in November 2014. [AR 252]. At Dr. Minkoff's request, Sanesco International performed a hypothalamic-pituitary-adrenal axis assessment on Ms. Ness and recommended that she be prescribed medicine for inhibitory support, gamma-amino butyric acid support, adrenal support, and hot flashes/anxiety. [AR 254]. Following these tests, Ms. Ness reported to Dr. Minkoff via e-mail that she was seeing improvements, such as not becoming anxious around a large amount of people. [AR 315]. However, in February 2015, Ms. Ness reported continued problems, including panic attacks, hot flashes, rapid breathing, and restlessness. [AR 308]. Dr. Minkoff had Ms. Ness take a blood hormone test and opted to continue the prescribed treatment without any changes. [AR 306].

In March 2015, Ms. Ness reported to Dr. Minkoff that she experienced another panic attack. [AR 304]. However, prior to this incident, she had not had a panic attack "for a long time" and was becoming more comfortable around other people. [AR 305].

In May 2015, Ms. Ness' mother informed Dr. Minkoff that Ms. Ness was feeling much better and had visited the mall, Starbucks, and a grocery store on her own. [AR 295]. In response, Dr. Minkoff suggested that Ms. Ness continue taking supplements, exercising, and following a paleo diet. [AR 294].

In other e-mails to Dr. Minkoff in July 2015, Ms. Ness reported that she was experiencing mood swings, hot flashes, restlessness, anxiety, lack of energy, an enlarged thyroid, and a bloated stomach. [AR 283–85]. Regarding the enlarged thyroid, Ms. Ness visited Mallory Sessions, PA, who advised Ms. Ness to get an ultrasound and a thyroid stimulating hormone ("TSH") test. [AR 348]. The ultrasound revealed that Ms. Ness' thyroid nodule was decreasing in size and ultimately benign, and the TSH test result was within the normal range. [AR 333–35]. During this time, Ms. Ness updated Dr. Minkoff that she had pleasant experiences visiting a museum, grocery shopping, taking an Uber, and visiting Starbucks, all of which she did by herself. [AR 287].

In August 2015, Christine Seville, MA, OTR, noted that Ms. Ness' results from the Woodcock Johnson Test of Cognitive Disabilities showed "moderate deficiencies in most areas." [AR 246]. Among other issues, Ms. Seville reported that Ms. Ness has mild limitations in understanding, remembering, and carrying out simple instructions; mild limitations in interacting appropriately with the public; and moderate limitations in responding appropriately to usual work situations and changes in a routine work setting. [AR 246–47]. Further, following a stress questionnaire, Ms. Seville concluded that Ms. Ness would be unable to perform the following work-related mental activities on a sustained basis: understanding, remembering, and carrying out simple instructions; making simple work-related decisions; responding appropriately to supervision, co-workers, and usual work situations; and dealing with changes in work setting. [AR 250].

Nancy Cason, Pys.D., examined Ms. Ness in October 2015 and gave her an adaptive behavior composite score of thirty-six, a percentile rank of less than one. [AR 355]. In each of

the individual categories—communication, daily living skills, and socialization—Ms. Ness also scored below the first percentile. [*Id.*] Based on the examination, Dr. Cason concluded that Ms. Ness has "broad deficits as compared to same-age peers," requiring long-term support from caregivers. [AR 258].

Following her appointment with Dr. Cason, Dr. Anne Wein gave Ms. Ness a vocational rehabilitation evaluation. [AR 213]. Dr. Wein opined that Ms. Ness' borderline intellectual functioning and significant deficits in interpersonal skills have reduced her capacity for competitive employment in an eight-hour work day. [*Id.*] Dr. Wein ultimately concluded that Ms. Ness cannot maintain competitive employment. [*Id.*]

## II. Procedural History

Ms. Ness asserts she first became disabled on December 24, 2013. [AR 132]. On August 21, 2014, the SSA initially denied Ms. Ness' application for DIB. [AR 81–83]. Ms. Ness subsequently requested a hearing before an ALJ, which took place on April 27, 2016. [AR 46].

On June 1, 2016, the ALJ issued an opinion holding that Ms. Ness is not disabled. [AR 27–41]. According to the ALJ, although Ms. Ness has a severe impairment, it does not meet the severity of any of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. [AR 31]. The ALJ then held that, despite Ms. Ness' limitations, she is capable of performing a full range of work (with some non-exertional limitations), including her past work as a courtesy clerk. [AR 33–34; 40].

The SSA Appeals Council subsequently denied Ms. Ness' request for review, making the SSA Commissioner's denial final for the purpose of judicial review. *See* [AR 1–4]; *see* 20

C.F.R. § 416.1481 ("The Appeals Council's decision, or the decision of the administrative law judge if the request for review is denied, is binding unless you or another party file an action in Federal district court, or the decision is revised."). Ms. Ness timely appealed the ALJ/Commissioner's final decision to this Court. Compl., ECF No. 1.

### III. Hearing Testimony

The ALJ held a hearing regarding Ms. Ness' application on April 27, 2016. [AR 48]. Ms. Ness and a vocational expert testified at the hearing. [*Id.*] Ms. Ness stated that she volunteers at an animal shelter for three hours each week but has not worked a job since 2013. [AR 51]. Ms. Ness informed the ALJ that her last job was at King Soopers, where she was a courtesy clerk. [*Id.*] She testified that she was fired because of a customer complaint. [AR 52].

Prior to her job at King Soopers, Ms. Ness worked as a courtesy clerk at Safeway until she was fired due to a conflict with the manager and customers. [AR 53]. She also worked as a courtesy clerk at Whole Foods and Knob Hill General Store for brief periods of time. [AR 53–54]. Ms. Ness testified that her job at Whole Foods was short-lived, because she was "too slow." [AR 54]. She left her job at Knob Hill because her ex-boyfriend was harassing her at work. [*Id.*]

Ms. Ness then testified that she can still perform the work of a courtesy clerk, because she is taking supplements that she did not have when she was at King Soopers or Safeway. [AR 55]. These supplements help alleviate her anxiety and panic attacks. [*Id.*]

When asked by the ALJ what triggers her anxiety, Ms. Ness responded that she can become anxious in public places with many people and when she is alone at home. [AR 56–57].

While working at King Soopers, she would get anxious but did not have panic attacks. [AR 57]. When Ms. Ness became anxious, she would either take a restroom break or go outside and work the grocery carts. [AR 57–58]. If she was in the middle of bagging for a customer, she would finish the task before leaving the area. [AR 58].

The ALJ then asked if Ms. Ness had ever been prescribed medication for panic attacks and anxiety. [*Id.*] Ms. Ness responded that she had only taken supplements, which she believed are working. [*Id.*]

Regarding her activities of daily living, Ms. Ness stated that she cleans, watches television, plays with her cat, colors, walks, writes stories, and rides her bike. [*Id.*] Ms. Ness also testified that she is able to cook for herself. [AR 60]. The ALJ then asked about Ms. Ness' driver's license. [AR 59]. Ms. Ness testified that she lost her license after accumulating too many points, including two accidents and citations for speeding. [*Id.*] Since she does not drive, Ms. Ness occasionally uses Uber for transportation. [AR 60].

In response to the ALJ's question regarding personal finances, Ms. Ness stated that she struggles with math, including counting change and managing a checkbook. [AR 61]. She testified that she uses a debit card to make purchases and calls a phone number to check the card's balance. [AR 61–62].

Ms. Ness' attorney then questioned her. [AR 62]. Ms. Ness stated that she has to submit saliva and urine samples every six months to receive her supplements, which are sent to her in the mail. [*Id.*] She also testified that she previously went to Learning RX to get help with math skills but does not currently receive any schooling. [AR 62–63].

Following Ms. Ness' testimony, the ALJ questioned the vocational expert. [AR 63].

7

The ALJ had the vocational expert imagine a hypothetical individual who is forty-two years old; has a high school education and has worked as a courtesy clerk; can understand, remember, and carry out simple static tasks; must avoid commercial driving; must be able to use ear protection in areas with high noise levels; and must not perform any production quota driven work. [AR 64]. The ALJ asked the expert whether this individual could perform Ms. Ness' past work as a courtesy clerk. [*Id.*] The expert opined that an individual with these limitations could perform such work. [*Id.*]

The ALJ then added to the hypothetical the condition that the individual is unable to sustain attention and focus on tasks for one third of the work day. [*Id.*] With this additional restriction, the expert stated that the individual would not be able to do Ms. Ness' past work. [*Id.*] The ALJ then returned to the original hypothetical and added the requirement that the individual needs frequent supervision in order to complete tasks. [AR 64–65]. The expert opined that the individual would not be able to maintain employment. [AR 65].

Finally, Ms. Ness' attorney questioned the vocational expert. [*Id.*] The expert testified that it often takes only one complaint for a courtesy clerk to be terminated. [*Id.*] The expert further stated that a person with sixth to eighth grade reading, sixth grade spelling, and second grade math levels likely has the functional educational level to be a courtesy clerk. [AR 66]. But the expert noted that an individual with a work tolerance of only two or three hours (presumably per day) or eight hours per week could not perform a courtesy clerk's duties. [*Id.*]

## LEGAL STANDARDS

### I. SSA's Five-Step Process for Determining Disability

I will review the ALJ's application of the five-step sequential evaluation process used to

determine whether an adult claimant is "disabled" under Title II of the Social Security Act, which is generally defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(B); *see also Bowen v. Yuckert*, 482 U.S. 137, 140 (1987).

Step one determines whether the claimant is presently engaged in substantial gainful activity. If he is, he is not disabled. *See* 20 C.F.R. § 404.1520. Step two analyzes whether the claimant has a medically severe impairment or combination of impairments, as governed by 20 C.F.R. § 404.1520(c). If the claimant is unable to show that his impairment(s) would have more than a minimal effect on his ability to do basic work activities, he is not eligible for disability benefits. *See id.* Step three analyzes whether the impairment is equivalent to one of a number of listed impairments deemed to be so severe as to preclude substantial gainful employment. *See* 20 C.F.R. § 404.1520(d). If the claimant's impairment is listed or is equivalent to a listed impairment, he is presumed to be disabled. If the impairment does not satisfy step three, the ALJ must proceed to step four, which requires the claimant to show that his impairment(s) and assessed residual functional capacity ("RFC") prevent him from performing work that he has performed in the past. If the claimant is capable of performing his previous work, either as he performed it or as it is generally performed in the national economy, he is not disabled. *See* 20 C.F.R. § 404.1520(e), (f); *see also Andrade v. Sec'y of Health & Human Servs.*, 985 F.2d 1045, 1051 (10th Cir. 1993) ("[C]laimant bears the burden of proving his inability to return to his particular former job and to his former occupation as that occupation is generally performed throughout the national economy."). However, if the claimant establishes a prima facie case of

disability based on the previous four steps, the analysis proceeds to step five, where the SSA Commissioner has the burden to demonstrate that the claimant has the RFC to perform other work in the national economy in view of his age, education, and work experience. *See* 20 C.F.R. § 404.1520(g).

## II. Standard of Review

My review is limited to whether the final decision is supported by substantial evidence in the record as a whole and whether the ALJ applied the correct legal standards. *See Williamson v. Barnhart*, 350 F.3d 1097, 1098 (10th Cir. 2003); *see also White v. Barnhart*, 287 F.3d 903, 905 (10th Cir. 2001). Thus, the function of my review is "to determine whether the findings of fact . . . are based upon substantial evidence and inferences reasonably drawn therefrom. If they are so supported, they are conclusive upon the reviewing court and may not be disturbed." *Trujillo v. Richardson*, 429 F.2d 1149, 1150 (10th Cir. 1970); *Bradley v. Califano*, 573 F.2d 28, 31 (10th Cir. 1978). "Substantial evidence is more than a scintilla, but less than a preponderance; it is such evidence that a reasonable mind might accept to support the conclusion." *Campbell v. Bowen*, 822 F.2d 1518, 1521 (10th Cir. 1987). I may not reweigh the evidence nor substitute my judgment for that of the ALJ. *Bowman v. Astrue*, 511 F.3d 1270, 1272 (10th Cir. 2008) (quoting *Casias v. Sec'y of Health & Human Servs.*, 933 F.2d 799, 800 (10th Cir. 1991)). However, reversal may be appropriate when the ALJ either applies an incorrect legal standard or fails to demonstrate reliance on the correct legal standards. *See Winfrey v. Chater*, 92 F.3d 1017, 1019 (10th Cir. 1996).

## **THE ALJ'S RULING**

The ALJ first ruled that Ms. Ness meets the insured status requirements of the Social

Security Act through September 30, 2018. [AR 29]. Next, the ALJ determined that Ms. Ness has not engaged in substantial gainful employment since December 24, 2013—the alleged onset date. [*Id.*] At step two, the ALJ held that Ms. Ness suffers from mild intellectual disability. [*Id.*]

Moving to step three, the ALJ found that Ms. Ness does not have an impairment or combination of impairments that meets or medically equals the severity of one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. [AR 31–33]. Specifically, the ALJ found Ms. Ness' severe impairment does not equal Listing 12.05 for intellectual disability, because Ms. Ness does not have an IQ of 60 through 70, a physical or other mental impairment imposing an additional and significant work-related limitation, or deficits in adaptive functioning initially manifested during the developmental period. [AR 31] Further, even if Ms. Ness did have such deficits, the ALJ stated that her anxiety and mild hearing loss are non-severe impairments that do not significantly limit her work-related functioning. [AR 32]. Finally, the ALJ relied on evidence of Ms. Ness' daily routine and work history to conclude that she does not have marked difficulties in activities of daily living, social functioning, or maintaining concentration, persistence, or pace, and she has not had episodes of decompensation for an extended duration. [AR 32–33].

At step four, the ALJ held that Ms. Ness has an RFC to perform a full range of work at all exertional levels. [AR 33–34]. The ALJ limited Ms. Ness to static tasks that can be learned through demonstration in thirty days or less and do not require mathematic calculations. [*Id.*] Additionally, the ALJ stated that Ms. Ness must avoid commercial driving and must be able to use ear protection in areas with high noise levels, such as industrial settings. [AR 34]. In

making her determination, the ALJ relied on Ms. Ness' psychological evaluations, her testimony at the hearing, her activities of daily living, and the medical record. [AR 34–40].

While the ALJ found that Ms. Ness' impairment could reasonably be expected to cause the alleged symptoms, she did not believe that Ms. Ness' statements concerning the intensity, persistence, and limiting effects of the symptoms were consistent with the evidence in the record. [AR 36].

The ALJ then discussed how the various medical opinions influence Ms. Ness' RFC. [AR 36–40]. The ALJ recognized that Dr. Benson's psychological examination of Ms. Ness shows significant intellectual limitations, but she also noted that Dr. Benson acknowledged Ms. Ness maintained entry level jobs in the past. [AR 37]. The ALJ afforded Ms. Seville's opinions regarding marked limitations some weight, since the Woodcock Johnson Test of Cognitive Disabilities showed only moderate deficiencies in most areas. [*Id.*] Further, the ALJ gave little weight to Ms. Seville's opinion that Ms. Ness has difficulty concentrating for more than ten to fifteen minutes at a time. [AR 38].

The ALJ also afforded little weight to Dr. Wein's opinions, because they are inconsistent with the record and Dr. Wein is not an accepted medical source. [*Id.*] The ALJ afforded only some weight to Dr. Cason's opinion on Ms. Ness' adaptive behavior composite score, since it is based on subjective reports and is inconsistent with the record. [AR 39]. Specifically, the ALJ stated that Dr. Cason's reports regarding Ms. Ness' inability to care for herself, interact with the public, or prepare simple meals are not supported by the rest of the evidence. [*Id.*] Additionally, again citing inconsistency with the record, the ALJ afforded little weight to Dr.

Cason's opinion that Ms. Ness has significant deficits in adaptive functioning and symptoms of mental illness that prevent her from maintaining employment. [AR 40].

The ALJ afforded great weight to Dr. Wharry's opinion that Ms. Ness could follow simple instructions, sustain an ordinary routine, and deal with changes in routine work setting. [*Id.*] However, the ALJ afforded less weight to Dr. Wharry's opinion that Ms. Ness is unable to tolerate any interaction with the general public, since it is not supported by Ms. Ness' activity levels and work history. [*Id.*]

Lastly, the ALJ found that Ms. Ness is capable of completing the duties of a courtesy clerk as that position is generally performed in the national economy. [*Id.*] The ALJ found persuasive the vocational expert's testimony that Ms. Ness' limitations would not affect the performance of her past relevant work as a courtesy clerk. [AR 41]. As such, the ALJ held that Ms. Ness has not been disabled from December 24, 2013 through the date of the decision. [*Id.*]

## ANALYSIS

Ms. Ness' sole argument for reversal is that the ALJ improperly rejected the opinion of Dr. Wharry (the state agency psychological consultant) that she must have minimal to no interaction with the general public. Opening Br. 3–7, ECF No. 16. Defendant contends the ALJ sufficiently supported her determination to apply little weight to this part of Dr. Wharry's opinion. Resp. Br. 5–7, ECF No. 19. Specifically, Defendant asserts Ms. Ness' daily activity level and work history constitute substantial evidence supporting the ALJ's finding that Ms. Ness has the RFC to perform her past work. I agree with Defendant.

The ALJ must consider all medical opinions in the record and discuss the weight assigned to each opinion, including the opinions of state agency medical consultants. *Mays v. Colvin*,

739 F.3d 569, 578 (10th Cir. 2014). The presumptive weight assigned to a medical opinion varies depending on the type of medical source. *Robinson v. Barnhart*, 366 F.3d 1078, 1084 (10th Cir. 2004) ("The opinion of an examining physician is generally entitled to less weight than that of a treating physician, and the opinion of an agency physician who has never seen the claimant is entitled to the least weight of all."); *see also* 20 C.F.R. §§ 404.1527(d)(1)–(2), 416.927(a)(1)–(2). Because evaluations from non-treating physicians are based upon limited contact and examination, they are of "suspect reliability." *Frey v. Bowen*, 816 F.2d 508, 515 (10th Cir. 1987).

However, an ALJ's decision to assign less weight to a non-treating physician's opinion must still be supported by substantial evidence. *See Haddock v. Apfel*, 196 F.3d 1084, 1088 (10th Cir. 1999). Substantial evidence is "more than a scintilla, but less than a preponderance; it is such evidence that a reasonable mind might accept to support the conclusion." *Campbell v. Bowen*, 822 F.2d 1518, 1521 (10th Cir. 1987). Thus, an ALJ's decision will typically be affirmed unless the "record evidence overwhelmingly contradicts the ALJ's conclusion." *Newbold v. Colvin*, 718 F.3d 1257, 1265 (10th Cir. 2013).

Here, the ALJ cited inconsistencies between Dr. Wharry's opinion and Ms. Ness' work history and daily activity level. [AR 40]. Additionally, Dr. Benson's and Ms. Seville's opinions and Ms. Ness' own testimony conflict with Dr. Wharry's opinion. As I explain in further detail below, this constitutes substantial evidence supporting the ALJ's conclusion.

Work history may be relevant to an ALJ's evaluation of a medical source's opinion, as a claimant's work history can be highly probative of cognitive ability. *See Harrold v. Astrue*, 299 F. App'x 783, 788 (10th Cir. 2008) (unpublished). Indeed, courts regularly assign less weight to

14

an opinion when it is inconsistent with work history. *See Parker v. Berryhill*, No. 16-2588-EFM, 2017 WL 3229075, at *6 (D. Kan. July 31, 2017) (concluding that the ALJ did not err by discrediting a physician's opinion due to inconsistency with the claimant's work history); *Perry v. Colvin*, No. 11-CV-470-TLW, 2013 WL 953545, at *12 (N.D. Okla. Mar. 12, 2013) (explaining that it is proper for an ALJ to consider a claimant's work history in determining whether a physician's opinion is inconsistent with the record).

The ALJ emphasized that Ms. Ness' work history includes courtesy clerk positions at King Soopers, Whole Foods, Knob Hill, and Safeway, all of which required her to interact with the public and some of which lasted for as long as two to three years. [AR 153]. Although Ms. Ness asserts in her response brief that she was terminated from these positions, she was never terminated due to an inability to interact with the general public. At King Soopers, she was fired because of a customer complaint. [AR 52]. Safeway fired her due to a conflict with the manager and customers. [AR 53]. Ms. Ness stated that her time at Whole Foods was brief because she was "too slow." [*Id.*] Finally, Ms. Ness left her job at Knob Hill because her ex-boyfriend was harassing her at work. [AR 54]. Thus, Dr. Wharry's opinion that Ms. Ness "must have minimal to no interaction with the general public" is inconsistent with Ms. Ness' work history, and it was appropriate for the ALJ to discredit this part of the opinion.

An ALJ may also consider a claimant's daily activities in determining whether a person is entitled to disability benefits. *Gossett v. Bowen*, 862 F.2d 802, 807 (10th Cir. 1988); *Watts v. Berryhill*, 705 F. App'x 759, 763 (10th Cir. 2017) (unpublished) (explaining that an ALJ must consider such factors as a claimant's daily activities when making credibility determinations). The ALJ found that Dr. Wharry's opinion regarding Ms. Ness' social limitations is "not

15

supported by [Ms. Ness'] activity levels." [AR 40]. I agree that evidence in the record raises doubts that Ms. Ness must have minimal to no interaction with the general public. According to her brother, Ms. Ness has no problem going outside alone or riding her bike, and she had a driver's license before it was revoked due to tickets and accidents. [AR 203]. The record also indicates that Ms. Ness had good experiences visiting a museum, grocery shopping, taking an Uber, and visiting Starbucks, all of which she did by herself. [AR 287]. Although such activities alone do not constitute substantial evidence in support of the ALJ's finding, *see Thompson v. Sullivan*, 987 F.2d 1482, 1490 (10th Cir. 1993), they provide at least some support for the ALJ's decision to assign less weight to Dr. Wharry's opinion.

Additionally, other evidence in the record supports the ALJ's partial rejection of Dr. Wharry's opinion. Dr. Benson opined that Ms. Ness "could do many things" in terms of job choices by drawing on existing knowledge and experience. [AR 240]. Also, Ms. Seville reported that Ms. Ness has only mild limitations in interacting appropriately with the public. [AR 247]. Perhaps most importantly, Ms. Ness testified that she thinks she can still do the work of a courtesy clerk. [AR 55]; *see Perez-Leeds v. Colvin*, 596 F. App'x 714, 720 (10th Cir. 2014) (unpublished) (holding that it was proper for the ALJ to consider whether the limitations proposed in a physician's opinion were consistent with claimant's own testimony about her abilities and daily activities).

Although some evidence exists contradicting the opinions and testimony discussed above, I may not reweigh the evidence or substitute my judgment for that of the Commissioner. *Harper v. Colvin*, 528 F. App'x. 887, 890 (10th Cir. 2013) (unpublished); *Hackett v. Barnhart,* 395 F.3d 1168, 1172 (10th Cir. 2005). I am limited to reviewing whether "factual findings are supported

by substantial evidence in the record and whether the correct legal standards were applied." *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007) (quoting *Hackett,* 395 F.3d at 1172).  By citing Ms. Ness' work history and daily activity level, the ALJ adhered to the correct legal standard and provided substantial evidence for partially discounting Dr. Wharry's opinion.

## CONCLUSION

The ALJ did not commit error in determining that Ms. Ness was not disabled from December 24, 2013 through the date of this decision.  Specifically, the ALJ relied on substantial evidence in assigning little weight to Dr. Wharry's opinion that Ms. Ness must have "minimal to no interaction with the general public."  Accordingly, the decision that Ms. Ness was not disabled is **affirmed**.

Dated at Denver, Colorado this 19th day of July, 2018.

BY THE COURT:

*Michael E. Hegarty*

Michael E. Hegarty
United States Magistrate Judge